Fuller A. Kimbrell and Reba Kimbrell v. Commissioner.Kimbrell v. CommissionerDocket Nos. 81427 and 87697.United States Tax CourtT.C. Memo 1965-115; 1965 Tax Ct. Memo LEXIS 215; 24 T.C.M. (CCH) 602; T.C.M. (RIA) 65115; April 28, 1965*215 Walter L. Mims and Elliott T. Williams, Jr., 1010 Massey Bldg., Birmingham, Ala. 35203, for the petitioners. Ford P. Mitchell, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1955 and 1956 in the amounts of $22,537.32 and $16,387.58, respectively, and additions to the tax for these years under section 6653(b) of the Internal Revenue Code of 1954 in the respective amounts of $12,057.03 and $11,498.34. The issues for decision are: (1) Whether amounts reported by Contractors Paint and Supply Company, Inc., and Contract Supply Company, Inc., as commission income received during the years 1955 and 1956, was in fact petitioners' income and therefore taxable to them in those years. (2) Whether the commission income received by Fuller A. Kimbrell from John Deere Plow Company in 1956 in the amount of $26,700.97 which he failed to report should be offset in its entirety or in an amount greater than allowed by respondent for overstatement of sales of his two stores included in his taxable income. Respondent in his brief concedes*216 that petitioners are not liable for the additions to tax determined by him under the provisions of section 6653(b) of the Internal Revenue Code of 1954 in either the year 1955 or 1956. In their petition for the year 1955, petitioners assigned error to respondent's failure to allow their claim for refund for the year 1955 based on a claimed net operating loss carryback from 1957 but at the trial introduced no evidence with respect to this allegation of error and on brief make no argument with respect thereto or any denial of the statement contained in respondent's brief that "petitioners abandoned their claim for refund for the taxable year 1955." We therefore consider that petitioners have abandoned the issue raised with respect to the respondent's failure to allow their claim for refund. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Fayette, Alabama, filed joint Federal income tax returns for the calendar years 1955 and 1956 with the district director of internal revenue for the District of Alabama. Fuller A. Kimbrell (hereinafter referred to as petitioner) was during the*217 years here in issue and had been for many years prior thereto, an authorized John Deere Plow Company dealer. He owned and operated as a sole proprietorship farm implement stores in Fayette, Alabama and Columbus, Mississippi. These stores did business under the name of Kimbrell's of Fayette and Kimbrell's of Columbus. During the years 1955 and 1956 each of these stores was operated under the supervision of a manager, the manager of the Fayette store being Richard Thomson (hereinafter referred to as Richard), and the manager of the Columbus, Mississippi store, W. J. Thomson, Jr. (hereinafter referred to as Thomson). Both Richard and Thomson were nephews of petitioner. Petitioner, during the years 1955 and 1956, was Director of Finance of the State of Alabama and during these years temporarily resided in Montgomery, although he returned on many weekends to Fayette. As Director of Finance during the years 1955 and 1956, petitioner was in the position of approving purchases for the State of Alabama and could prevent purchases by the State of products from any particular individual or business concern. If he had some particular person or concern from whom he wished purchases to be made, *218 he would tell the purchasing agent who was his subordinate that if an item could be procured from this person or concern at a fair price to purchase it from that person or concern. The net income as shown by the books and records of petitioner's two stores was reported by petitioners on their Federal income tax returns for the years 1955 and 1956. Contract Supply Company, Inc., of Fayette, Alabama, was organized as an Alabama corporation on April 15, 1955. The officers and stockholders of record of this corporation were as follows: shares ofOfficersOfficestockPar valueT. E. FarnedPresident45$ 450E. J. MillerVice president45450Raymond C. GordonSecretary-Treasurer10100100$1,000 The 45 shares issued to Farned were evidenced by two certificates, one for 20 shares and the other for 25 shares, and the 45 shares issued to Miller were similarly evidenced by two certificates of 20 and 25 shares each. The two 25-share certificates were endorsed by Farned and Miller in blank and handed to Raymond C. Gordon (hereinafter referred to as Gordon). Gordon was and is an accountant, and he had for a number of years prior to 1955, and*219 has since 1955, done the accounting work for petitioner's businesses and for petitioner personally. During the years 1955 and 1956 Contract Supply Company, Inc., received commission income as follows: 1955DatePayorCheck No.Amount11-16-55Alabama Asphalt Company6460$1,345.006- 3-55Prismo Safety Corporation100852,684.638-26-55Prismo Safety Corporation10891355.927-27-55Wald Industries9003106.647- 55Wald Industries1.579-28-55Wald Industries964035.0410- 9-55Wald Industries8.2510-12-55Wald Industries9803224.25Total$4,761.3019564-11-56Alabama Asphalt Company6996$1,193.981-20-56Prismo Safety Corporation12304220.001-25-56Prismo Safety Corporation12348555.762-10-56Prismo Safety Corporation12479897.963- 9-56Prismo Safety Corporation127511,320.0011-30-56Prismo Safety Corporation15498660.006-27-56Wald Industries12331500.001/-31-56Wald Industries1359514.4711- 7-56Wald Industries1366417.22Total$5,379.39 All of the commission income received during the years 1955 and 1956 by Contract Supply Company, Inc., was*220 with respect to sales made to the State of Alabama. The corporate income tax returns of Contract Supply Company, Inc., for the fiscal years ended April 30, 1956, and April 30, 1957, reflect income, expenses, and Federal income taxes paid for these years as follows: 4-30-564-30-57Income: Receipts$8,949.00$1,231.66Expenses: Legal and auditing$264.50$132.75Taxes183.8023.02Office supplies10.7712.50459.07168.27Net profit$8,489.93$1,063.39Federal income tax paid2,546.98319.02The earned surplus of Contract Supply Company, Inc. as of April 30, 1957, amounted to $6,687.32. According to the books and records of Contract Supply Company, Inc. the earned surplus and capital stock were distributed as follows: Nature ofDatePaymentGordonMillerFarned12- 1-56Check$ 700.007-15-57Check68.737-15-57Check$1,537.467-15-57Check500.0012- 1-56Check$1,000.007-15-57Check537.467-15-57Check3,343.67Totals$4,112.40$2,037.46$1,537.46Grand Total$7,687.32The books of Contract Supply Company, Inc. also*221 showed the following explanations for the final checks which were issued to the stockholders: 7-15-57T. E. FarnedTreasury purchase of stock$ 537.467-15-57E. J. MillerTreasury purchase of stock1,537.467-15-57Raymond C. GordonTreasury purchase of stock203.737-15-57E. J. MillerPayment of loan to Fuller A. Kimbrell500.00for investment in stock - Chg. toF.A.K.7-15-57Raymond C. GordonFor transfer to Contractors Paint &3,343.67Supply Co., Inc., Columbus, Miss.(and to close this bank account forMr. Fuller A. Kimbrell)E. J. Miller (hereinafter referred to as Miller) was a friend of petitioner's. He has never seen the 25 shares of stock of Contract Supply Company, Inc., that he endorsed in blank and delivered to Gordon, and he does not know what disposition was made of them. Miller, during the years 1955 and 1956, made no effort whatsoever to sell any products on behalf of Alabama Asphalt Company, Prismo Safety Corporation, or Wald Industries, and rendered no services of any kind to Contract Supply Company, Inc. T. E. Farned (hereinafter referred to as Farned) was also a friend of petitioner's. He*222 does not know what disposition was made of the 25 shares of stock of Contract Supply Company, Inc., that he endorsed in blank. He knows nothing about Wald Industries, and he made no effort to sell products of that company or of Alabama Asphalt Company or of Prismo Safety Corporation to the State of Alabama. He rendered no services of any nature for Contract Supply Company, Inc. Contractors Paint and Supply Company, Inc. was organized on April 5, 1955, as a Delaware corporation. The certificate of incorporation was filed in Wilmington, Delaware, and the corporation was registered to transact business in the State of Alabama. The officers and stockholders of record were as follows: StockholdingsOfficersOfficeSharesPar ValueW. J. Thomson, Jr.President80$ 800.00D. F. MobleyVice President10100.00Raymond Gordon10100.00Total100$1,000.00During the years 1955 and 1956 Contractors Paint and Supply Company, Inc., received commission income as follows: PayorMinnesotaMining Co.CheckAmountDateNo.195519567- 9-55$ 1,000.007-20-551,081.738-17-550387101,057.0010- 3-5507030110,000.0010- 6-550718911,287.5012- 7-5508774416,315.0012- 7-550877406,250.0012-31-55088993390.151-11-56003179$ 344.252-21-56014804537.404-13-56029934722.936- 2-560508381,565.417-10-560550112,125.007-31-56060787344.259- 6-5607153124.2210-25-56086166280.3010-26-56087030619.6510-27-56105243137.20Total$37,381.38$6,700.61*223 All of the commissions received by Contractors Paint and Supply Company, Inc., were with respect to sales made to the State of Alabama. The corporate income tax returns of Contractors Paint and Supply Company, Inc. for the fiscal years ended April 30, 1956, and April 30, 1957, reflect income, expenses, and Federal taxes paid as follows: F/Y EndingF/Y Ending4-30-564-30-57TotalsCommissions received$38,985.96$8,994.38$47,980.34Interest income0610.63610.63$38,985.96$9,605.01$48,590.97Expenses claimed18,844.045,749.9524,593.99Net profit$20,141.92$3,855.06$23,996.98Federal income tax paid6,042.581,156.527,199.10Earned surplus$14,099.34$2,698.54$16,797.88 The interest income received by Contractors Paint and Supply Company, Inc., was from loans made to Ed Butler, a friend of petitioner's, which loan was made at petitioner's request, and on a loan made by Contractors Paint and Supply Company, Inc., to the Styles Hotel Company in which petitioner owned a one-third interest. According to the books and records of Contract Paint and Supply Company, Inc. the expenses claimed on the corporate returns were*224 in the amounts and for the following purposes: 4-30-56Auditing &OfficeSales &DatePayeeSalaryAccountingTaxesExpenseTravel12-31-55W. J. Thomson, Jr.$ 5,000.004-28-56W. J. Thomson, Jr.4,600.001- 8-56Robert Bonner3,200.004- 2-56Robert Bonner1,600.0012-21-55Raymond Gordon$ 500.003-28-56Raymond Gordon115.754-30-56Raymond Gordon1,200.001-20-56Sec. of State$ 5.004-30-56Dir. of Int. Rev.84.006-29-56Corp. Serv. Co.5.005-11-56State I.T.827.043-28-56Raymond Gordon$ 7.256-29-56Corp. Serv. Co.50.0012- 8-56W. J. Thomson, Jr.$ 450.004-30-56D. F. Mobley1,200.00Totals$14,400.00$1,815.75$921.04$ 57.25$1,650.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- 5-56A. M. McNeil$ 1,050.0012- 5-56Robert Bonner2,000.004-30-57Raymond Gordon$1,200.002-14-57Dir. of Int. Rev.$ 21.0010-26-57State I.T.89.958-29-56Corp. Serv. Co.$ 35.0010-26-57Corp. Serv. Co.50.004-30-57Organization Exp.104.004-30-57D. F. Mobley$1,200.00Totals$ 3,050.00$1,200.00$110.95$189.00$1,200.00*225 The amounts paid to Robert Bonner by checks of Contractors Paint and Supply Company, Inc., were drawn by Gordon after petitioner called him and told him that Bonner "could do and had done us boys a number of favors," that he needed money, and that petitioner wanted him to be paid money out of Contractors Paint and Supply Company, Inc. The amount paid to A. M. McNeil was by a check of Contractors Paint and Supply Company, Inc. drawn by Gordon at the suggestion of petitioner. Gordon had never met either Robert Bonner or A. M. McNeil. Thomson countersigned the checks of Contractors Paint and Supply Company, Inc., drawn by Gordon. One of the checks shown as made to Bonner was mailed to petitioner's office and Gordon thought possibly the other two checks shown as made to Bonner were made payable to petitioner. The following is a summary of the disposition of assets owned by Contractors Paint and Supply Company, Inc., as of April 30, 1957: DateDescriptionAmount7-15-57Check for loan to Gordon$ 600.009-30-57Payment to CorporationService Co.50.009-30-57Payment of Federal taxes1,156.529-30-57Payment of State taxes89.9510-23-57D. F. Mobley for stock1,779.7910-29-57Check - L. V. Poole - stockin Coosa Motor Co.7,000.0012-27-57Federal taxes49.981-25-58State taxes1.802- 6-58W. J. Thomson loan1,200.002- 7-58Check - L. V. Poole - stockin Coosa Motor Co.4,000.002- 8-58Balance in account74.19Total$16,002.23*226 Under date of June 17, 1955, Harry Heltzer, General Manager of Reflective Products Division of the Minnesota Mining and Manufacturing Company, addressed a letter to Contractors Paint and Supply Company, Inc., of Columbus, Mississippi, Attention: Mr. W. J. Thomson, Jr., which stated in part as follows: This will advise you of the appointment of the Contractor's Paint and Supply Company of Columbus, Mississippi as a special distributor of our Reflective Products to all departments and agencies of the State of Mississippi and to all departments and agencies of the State of Alabama. * * *In the State of Mississippi, in the absence of special arrangements, bids will be executed and entered by you in time to participate in all lettings in which these products are involved. In the State of Alabama, bids will be executed and entered by our company on a direct basis. When, in such cases, our company is the successful bidder, commissions will be credited to your account corresponding to the discounts shown on the attached list, or, in the case of items not listed, commissions will be based on the amounts of reflective sheeting or other reflective products involved. Periodically, *227 a tabulation and reconciliation will be made of your account. We are confident that cooperation between our companies will produce real results for both of us. We will appreciate your advising us by return mail of your acceptance of the terms of this arrangement. Harry Heltzer first heard of Contractors Paint and Supply Company, Inc., when he was introduced to Thomson by petitioner and the attorney who had done the legal work of forming the corporation. At this same meeting Heltzer was informed that Thomson had an organization known as Contractors Paint and Supply Company, Inc., that was considered as being a special distributor for sales of reflective products in Alabama and Mississippi. This information was given to Heltzer by either petitioner or the attorney. Heltzer never met any person associated with Contractors Paint and Supply Company, Inc., other than Thomson, and he knew of no specific services that were rendered to Minnesota Mining and Manufacturing Company by anyone connected with Contractors Paint and Supply Company, Inc. Heltzer was aware of the fact that petitioner was Director of Finance of the State of Alabama. The formation of the corporation which was given*228 the name, when formed, of Contractors Paint and Supply Company, Inc., had been discussed by Gordon and petitioner sometime before its formation. This corporation was organized by an attorney who was contacted by Gordon. No sales to the State of Mississippi were ever made through this corporation. Petitioner did not know of any sales made of the products of Minnesota Mining and Manufacturing Company to the State of Alabama subsequent to the time he became Director of Finance of the State of Alabama and prior to approximately July 1, 1955. Gordon did the accounting work for Contractors Paint and Supply Company, Inc. At no time during 1955 or 1956 did Gordon discuss sales to the State of Alabama with any representative of Minnesota Mining and Manufacturing Company. Gordon considered that Kimbrell was primarily responsible for the commissions paid to Contractors Paint and Supply Company, Inc. On June 12, 1957, petitioner executed a bill of sale which stated in part as follows: KNOW ALL MEN BY THESE PRESENTS, that I, FULLER KIMBRELL, of Montgomery, Alabama, for and in consideration of Thirty Thousand ($30,000.00) Dollars to me cash in hand paid by W. J. THOMSON, Jr., of Columbus, *229 Mississippi, and the endorsement, delivery and conveyance to me of 80 shares of common capital stock of CONTRACTORS PAINT & SUPPLY COMPANY, a Delaware Corporation, domiciled at Wilmington in said State, being certificates Numbers 4 through 11, both figures inclusive, representing 10 shares each, the receipt of all of which is hereby acknowledged, do hereby grant, bargain, sell, convey, assign and set over unto the said W. J. Thomson, Jr., the following described property, all of which now constitutes or is a part of a business heretofore operated by me under the trade name "Kimbrell's" on United States Highway 82 East within the corporate limits of the city of Columbus, Mississippi, and located upon the premises thereof, and which property is considered a part of "Kimbrell's", said property referred to being hereby described as follows: * * *At the time of the sale there was no dollar value set upon the assets of the store sold. The John Deere Plow Company had arranged to go in with Thomson on the purchase of the store and that company was to put up the $30,000 provided for and some amount for operating funds. Petitioner never told John Deere Plow Company about the stock constituting*230 any part of the purchase price for the store and his belief is that the John Deere Plow Company's records contained no reference to the fact that the sales price of the store included the Contractors Paint and Supply Company, Inc., stock. Thomson endorsed and delivered the 80 shares of Contractors Paint and Supply Company, Inc., stock issued in his name to petitioner in 1957. Petitioner at the time of trial still owned this stock. The corporation has not been legally dissolved. On April 6, 1956, the Montgomery Farm Equipment Company, a retail store which is wholly owned by the John Deere Plow Company, paid petitioner $26,700.97 as commissions on equipment sold. The check was made payable to Mitchell-David Company, Inc. Subsequently, and at the request of petitioner, the check payable to Mitchell-David Company was canceled and a new check issued to petitioner by the John Deere Plow Company in the same amount on October 11, 1956. This check was cashed by petitioner on October 22, 1956, at the First National Bank of Atlanta. The check was in some way connected with a division of profits between the John Deere Plow Company Montgomery store and petitioner. Some of the equipment with respect*231 to which this division of profits was made had been sold to the State of Alabama. In 1956 the following fictitious cash sales were entered on the books of Kimbrell's of Columbus and Kimbrell's of Fayette, the two stores operated by petitioner as sole proprietorships, with corresponding amounts of cash being deposited to the two stores' bank accounts: AmountDateAlleged PurchaserDepositedCharles Quarles$ 237.50Independent Construction Co.500.00Ralph Jones300.006-20-56Roy Johnston125.006-28-56James Gore1,000.009- 3-56K. A. Thompson3,650.009- 7-56Robert Raburn3,950.0010-20-56Billy Thompson400.0010-29-56Jack Butler275.0010-29-56Thompson Farm1,200.0010-30-56Ralph Macon3,000.0010-31-56Metal Scrap & Salvage Co.3,000.0011-16-56Luther Dyer115.00Robert Raburn435.00Albert Butler71.60Total$18,259.10The special agent who was assisting the revenue agent in the investigation of petitioner's tax liability for 1955 and 1956 attempted to locate some undisclosed sources of funds from which the overstatement of sales of petitioner's Columbus and Fayette stores might have come*232 other than the $26,700.97 check from John Deere Plow Company which petitioner had not included in his income and did not locate any such source. Petitioner on his income tax returns for each of the years 1955 and 1956 had reported an item of commission income but the item so reported in 1956 did not include the $26,700.97. Petitioners' joint income tax returns for the years 1955 and 1956 were also the subject of an investigation prior to the one which formed the basis of the deficiency notices from which the petitions in these cases were filed. The adjustments made in the prior investigation were as follows: 19551956Sale of Aliceville Inventory$5,000.000Capital Gains1,536.40$5,612.76Interest Paid1,625.30335.48Finance Company Reserve346.41(618.65)Other Income745.101,700.00Net Operating Loss Deduc-tion(4,966.06)4,996.06Bad Debts03,240.35Repairs01,471.03Dividends03.78Total$4,287.15$16,740.81These adjustments resulted in deficiencies in tax and negligence penalties as follows: YearTaxPenalty1955$1,576.73$ 78.8419566,609.10330.46Total$8,185.83$409.30Petitioners*233 on their income tax returns for 1955 and 1956 did not report any portion of the commissions which were received by Contractors Paint and Supply Company, Inc., and Contract Supply Company, Inc., during those years. The other income agreed to by petitioner after the first investigation of his income tax returns included an increase in commission income which did not relate either to the commissions received by the two corporations or the check received in 1956 from John Deere Plow Company and also included an estimated amount for groceries which were given to petitioners by various concerns from which the State of Alabama purchased food items. Respondent in his notice of deficiency for the year 1955 increased petitioners' income as reported and as previously adjusted by the amount of $41,517.41 which represented the commissions reported by Contractors Paint and Supply Company, Inc., as received from Minnesota Mining and Manufacturing Company for the year 1955 and the commissions reported by Contract Supply Company, Inc., as received from Prismo Safety Corporation, Alabama Asphalt Company, and Wald Industries for the year 1955 less an accounting fee of $500, legal and auditing expense*234 of $114.50, and office supplies of $10.77. Respondent in his notice of deficiency to petitioner for the year 1956 increased petitioner's income by $5,229.39 which was arrived at by subtracting from the commissions from Prismo Safety Corporation, Alabama Asphalt Company, and Wald Industries reported by Contractor Supply Company, Inc., in the amount of $5,379.39 for that year an amount of $150 designated as "accounting fee" and increased petitioner's reported income by an amount of $5,384.91 which was computed by subtracting from the commission income from Minnesota Mining and Manufacturing Company reported by Contractors Paint and Supply Company, Inc., of $6,700.61 plus $57.30 of interest income, the amount of $1,315.75 designated as "accounting fee" and $57.25 designated as "office expense," and further increased petitioner's income by the amount of $18,846.21 which was computed by subtracting from the $26,700.97 received by petitioner from the John Deere Plow Company a total amount of $7,854.76 stated to consist of $4,854.76 of cash deposited as alleged sales of the Fayette store and $3,000 deposited as alleged sales of the Columbus store. Ultimate Facts Neither Contract Supply*235 Company, Inc., nor Contractors Paint and Supply Company, Inc., engaged in any business during the years 1955 and 1956. The commission income reported by Contract Supply Company, Inc., and Contractors Paint and Supply Company, Inc., in the years 1955 and 1956 was earned by petitioner with respect to sales made to the State of Alabama, by Minnesota Mining and Manufacturing Company, Alabama Asphalt Company, Prismo Safety Corporation, and Wald Industries. The $26,700.97 received by petitioner from John Deere Plow Company in 1956 constituted taxable income to petitioner. Petitioners' reported income for the year 1956 was overstated in the amount of $18,259.10 by the fictitious sales entered on the books of Kimbrell's of Columbus and Kimbrell's of Fayette, the income from which operations was included in petitioners' income. Opinion It is respondent's position that the commissions paid to Contractors Paint and Supply Company, Inc., and to Contract Supply Company, Inc., were earned by petitioner and are includable in his taxable income. Respondent contends that the amounts were paid to induce petitioner to make purchases for the State of Alabama from the companies paying the commissions*236 and were paid by these companies to Contractors Paint and Supply Company, Inc., and Contract Supply Company, Inc., at petitioner's direction. The evidence supports respondent's position. Furthermore, the burden of proof in this case is upon petitioner to show error in respondent's determination, and petitioner has totally failed to meet that burden. The record shows that at the conclusion of the trial Thomson was in the courtroom. He had been subpoenaed by respondent, but respondent's counsel had stated that he would not call Thomson as a witness. At this juncture the Court stated to the parties that it appeared to the Court that Thomson would be the person who would have knowledge of the pertinent facts dealing with the payments by Minnesota Mining and Manufacturing Company to Contractors Paint and Supply Company, Inc., and other transactions bearing on the issues here involved. Thomson was the holder of record title to 80 shares out of 100 of the stock of Contractors Paint and Supply Company, Inc. According to Gordon he countersigned that company's checks. Petitioner introduced the representative of Minnesota Mining and Manufacturing Company to Thomson in making arrangements for*237 payment by that company to Contractors Paint and Supply Company, Inc. Thomson was the person to whom was addressed the letter from Minnesota Mining and Manufacturing Company offering to pay commissions to Contractors Paint and Supply Company, Inc., on sales in Alabama without requiring that any services be rendered for the payments. Thomson was the person who transferred the record title of 80 shares of stock in Contractors Paint and Supply Company, Inc., to petitioner in 1957. Thomson was petitioner's nephew and during the years here involved was the manager of his Columbus store. Thomson was the person to whom Gordon stated he delivered the 50 shares of stock of Contract Supply Company, Inc., endorsed in blank by Miller and Farned. There is no evidence in the record indicating that the relationship between Thomson and petitioner at the time of trial was other than friendly. Petitioner's failure to call Thomson not only leaves the record lacking in proof on pertinent factual issues, but raises the inference that had this witness been called, his testimony would have been unfavorable to petitioner. Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513*238 (C.A. 10, 1947). Petitioner on brief tries to place upon respondent the responsibility for his failure to call Thomson. Respondent had subpoenaed Thomson, but when he stated he did not plan to call Thomson as a witness, petitioner was afforded ample opportunity to call him. The record does not show that any services were rendered to Minnesota Mining and Manufacturing Company by Contractors Paint and Supply Company, Inc. The letter from Minnesota Mining and Manufacturing Company offering to pay commissions to Contractors Paint and Supply Company, Inc., indicates that no services were expected by that company on sales in Alabama in return for the commissions paid. Petitioner on brief argues that the testimony of Heltzer supports his position that the only "control" petitioner had over Contractors Paint and Supply Company, Inc., was that of a customer. 1 The ambiguous nature of Heltzer's testimony, particularly when considered in conjunction with his defensive attitude throughout his testimony and his statement that he knew of no services rendered to Minnesota Mining and Manufacturing Company by Contractors Paint and Supply Company, Inc., but that he considered that the payments*239 to that company aided his company in making sales in the State of Alabama, does not support petitioner's contention. *240 The amounts listed as paid as salaries by Contractors Paint and Supply Company, Inc., on its books were amounts paid at petitioner's direction, and the indication from the record is that no services were rendered to the corporations by the individuals to whom the payments were made. None of the recipients of these payments except Gordon was called as a witness by petitioner although petitioner's testimony indicates that each of the persons to whom payments were made was friendly toward him. The affirmative evidence in the record shows that no services were rendered by Contract Supply Company, Inc., to the companies which made commission payments to it and its own books list no employees. Who held the 50 shares of stock of the corporation endorsed in blank by Miller and Farned is left in doubt. At the trial Gordon said he delivered these shares to Thomson, but Thomson was not called as a witness to confirm or deny this statement or to state, if such were the fact, in what capacity he was holding the certificates. As more fully pointed out hereinafter, petitioner's testimony with respect to the activities of the officers as listed on the records of this corporation is directly contradicted*241 by the testimony of Farned and Miller. Petitioner argues that the corporate entity of Contractors Paint and Supply Company, Inc., and Contract Supply Company, Inc., should not be ignored for tax purposes. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). The record here indicates that it was never intended that either of these corporations engage in any business activity and that in fact neither of them ever did. They were merely the depository of commissions which petitioner procured but chose for obvious reasons to have paid to the corporations. The fact that these corporations were legally created juristic entities, does not require that the realities of the transaction giving rise to payments made to them be disregarded. See Jackson v. Commissioner, 233 F. 2d 289 (C.A. 2, 1956), affirming 24 T.C. 1, Cf. Higgins v. Smith, 308 U.S. 473 (1940). Even if these corporations had been shown to serve some business purpose, petitioner would not be permitted to have income he earned taxed to these corporations merely by having the payments made to the corporation instead of to himself. Lucas v. Earl, 281 U.S. 111 (1930),*242 and Helvering v. Horst, 311 U.S. 112 (i940). Petitioner argues that he was not a stockholder in either of these corporations and that there is no case in which payments to a corporation have been included in the taxable income of a person other than a stockholder. There is no credible evidence in the record to support the conclusion that petitioner was not the equitable owner of stock of each of these corporations even though he did not hold the record title to stock in either. The record shows that many of the payments made by checks of these corporations were made at the direction of petitioner. There is nothing to indicate that the payments made at petitioner's direction were not for his benefit. This would indicate that petitioner had equitable ownership of stock in and controlled these corporations. Petitioner contends that in any event the amounts were not income to him in the years here involved since he did not receive any money from the corporations in these years. From this record we cannot find that petitioner did not receive actual money from these two corporations in the years here in issue. Whether checks drawn to Thomson were in fact for use in petitioner's*243 business which Thomson managed is not shown by the record. The record contains an exhibit which shows that two checks (one drawn on December 30, 1955, and the other, on November 14, 1956, by Contractors Paint and Supply Company, Inc.) were deposited by Thomson in his bank account and on each of these days a check drawn by Thomson in an identical amount was deposited in the bank account of Kimbrell's of Columbus. Thomson was not called as a witness to explain these bank records. Who was the ultimate recipient of the funds from the checks shown by the records of Contractors Paint and Supply Company, Inc., as drawn to Bonner and McNeil, is not shown since neither Bonner nor McNeil was called as a witness. There is an inference in the record that these funds or some portion thereof may have gone to petitioner. Even if none of the funds actually found their way into petitioner's bank account in the 2 years here involved, such funds were subject to his complete control during the entire 2 years. Petitioner had complete control over to whom the commissions were paid and of the disposition of the amounts so received by the corporations during these years and this is sufficient to require*244 that these commissions be taxable to him. In reaching our conclusions herein, we have not overlooked the fact that petitioner testified that Miller and Farned rendered services to Contract Supply Company, Inc. 2 This testimony was directly contradicted by Miller and Farned, each of whom testified that he never attempted to make any sales for the companies who paid commissions to Contract Supply Company, Inc., or rendered any services to that corporation. Other portions of petitioner's testimony were contradicted by the testimony of Gordon, his accountant, particularly with respect to the control exercised by petitioner over the funds of the two corporations. Gordon, himself, was not an unbiased witness. His attempt to shade his testimony to support petitioner's contentions was apparent from observing him on the witness stand, particularly as he attempted to explain why certain of his testimony at the trial differed materially from that in a statement under oath which he had given respondent's agents. Other than the self-serving testimony of petitioner which in many respects is contradicted by other witnesses not unfriendly to him, there is no evidence to support the contention of*245 petitioner that he did not earn the commissions paid to the corporations and did not have control over the funds so paid. Gordon's testimony dealt almost entirely with entries on the corporate books from which he stated certain conclusions. In substance Gordon admitted that most of the entries were made at petitioner's direction. Gordon testified as to certain accounting services he rendered in connection with entering the commission checks on the corporate books and drawing checks on the corporate bank accounts. Respondent in his notice of deficiency allowed petitioner a deduction from*246 the commission income for accounting services. Gordon's testimony does not show the value of his services so we must assume that the amount allowed by respondent is adequate. Petitioner does not make an alternative contention that additional deductions should be allowed if respondent is sustained in his determination that the commissions paid to the two corporations are includable in his taxable income. Petitioner relies on the recent case of Paul A. Teschner, 38 T.C. 1003 (1962), as supporting his position that even if petitioner earned the income, it is not taxable to him since it was not payable to him. This case in no way supports petitioner's position herein. In the Teschner case the taxpayer could not have had the amount paid to himself. In the instant case there is no credible evidence to show that petitioner could not have had the commission payments made directly to himself instead of to the corporations. Petitioner admits that he did not report the $26,700.97 from John Deere Plow Company as such but states that the full amount was reported by overstatement of sales of his two stores. The overstatement of sales of these stores is stipulated to be $18,259.10. *247 In our opinion the fact that the store sales were overstated sufficiently shows an overstatement of income to that extent to conclude that petitioner's income after the addition of the commission items and item from John Deere Plow Company which we have found are properly includable for 1956 should be reduced by the amount of the overstatement. There is no evidence indicating that there were omitted items of income other than the ones we have found to offset this overstatement. Petitioner reported some commission income and there was some additional commission income which petitioner agreed should be included in his taxable income in the first investigation of his tax returns. Respondent's own agent testified that he could find no sources of income other than the ones by which petitioner's income was increased in the notice of deficiency to offset this overstatement. The parties argue whether or not the $18,259.10 of overstated sales which were represented by cash deposits to the bank accounts of the Fayette and Columbus stores came from the cash received in cashing the John Deere Plow Company check. Respondent contends that the amounts deposited prior to the date this check was*248 cashed could not have come from the proceeds of this check. Petitioner contends that it came from borrowings that he repaid with cash from the check. We do not consider the fact of the source of the cash which was placed in the bank accounts of the Fayette and Columbus stores to be determinative of whether petitioner's income for 1956 as computed should be reduced by the total amount of the deposits which represented fictitious sales written on the books of those companies. The fact is that petitioner's income was overstated by this amount, and the reasonable inference from the record is that the source of the funds was from income which is included in petitioner's taxable income after the reported taxable income is increased by the $26,700.97 of John Deere Plow Company commission and the other amounts as determined by respondent to be includable therein. We sustain respondent's determination of petitioner's taxable income except that we hold that for 1956 the amount so determined should be reduced by $10,404.34 representing the amount of the $18,259.10 of agreed overstatement of sales by petitioner which respondent has not allowed as a reduction in computing petitioner's taxable*249 income. Decision will be entered under Rule 50. Footnotes1. Petitioner on brief quotes a portion of the following testimony of Heltzer: Q. Mr. Heltzer, was the appointment, by your company, of Contractor's Paint and Supply Company primarily based on the fact that it was the recommendation made by Fuller Kimbrell, who was, at that time, Director of Finance for the State of Alabama? A. No, sir. Q. Pardon me? A. I said, no, sir. Q. What was it based on? A. On Mr. Fite and Mr. Kimbrell both. Q. Both of them? A. Both of them. Q. Did you know Mr. Fite prior to that date? A. Yes, sir. Q. How many years had you known him? A. I think I got acquainted with Mr. Fite in 1954. I believe we were looking for a plant site in the South here and that was when I got acquainted with him. * * *BY MR. MIMS: Q. Mr. Heltzer, as a matter of fact, Mr. Rankin Fite was an attorney for your company in Alabama, was he not? A. He did some legal work for us if I remember correctly. Q. So his recommendation was actually a recommendation of your own lawyer's, was it not? A. * * * Well, I didn't put that construction on it, but, under those circumstances, I presume it is correct.↩2. For example, petitioner testified as follows: Q. Mr. Kimbrell, did you discuss with Mr. Miller, at any time, the business of Contract Supply Company? A. I think I can answer that and clear that up. Mr. Miller and Mr. Farned usually came together. I don't remember that either one ever came individually, so I would say that about the same thing that applied to Mr. Farned would apply to Mr. Miller. They usually came together, and I was aware that they were stockholders in Contract Supply Company and they came to see me to get me to do business with these companies that they represented.↩